**SIGNED THIS: February 22, 2007**

                                          **THOMAS L. PERKINS**
                          **UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TIMOTHY J. DALEY, | ) | No. 05-87138 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| AGNESROSE MALIK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 06-8072 |
| | ) | |
| TIMOTHY J. DALEY, | ) | |
| Defendant. | ) | |

### O P I N I O N

This adversary proceeding is before the Court after trial on the Complaint filed by AgnesRose Malik, the Plaintiff (PLAINTIFF), against Timothy James Daley, the Debtor (DEBTOR), seeking a determination that a loan in the amount of $5,000 made to the DEBTOR is nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.

**FACTS**

The transaction which is the subject of the instant adversary proceeding involved a face-to-face meeting in May, 2002, between the PLAINTIFF, an elderly lady, the DEBTOR and Betty Haytcher.  Not present at that meeting was Bill Baldwin, the person alleged by the DEBTOR to have defrauded them all.  The PLAINTIFF and Mrs. Haytcher were long-time friends and had, over the years, jointly invested in various real estate projects.  Mrs. Haytcher's husband was the PLAINTIFF'S attorney at that time.[1]  At some point prior to May, 2002, Bill Baldwin, an acquaintance of the DEBTOR and a nephew of a good friend of Mrs. Haytcher, represented to Mrs. Haytcher and the DEBTOR, that he had access, by reason of an inheritance, to millions of dollars in England which he intended to bring to the United States, but needed funds to cover the cost of shipping.[2] Mrs. Haytcher, having been apprised of the opportunity through the DEBTOR, gave the DEBTOR a check for $3,000.  The DEBTOR also put in $2,000.  No agreement was made by either the DEBTOR or Mrs. Haytcher with Baldwin as to repayment or return on their investment, other than his oral assurances that each would be "well taken care of."

---

[1] That relationship ended by the time of trial.  Mrs. Haytcher testified that she borrowed $5,000 from the PLAINTIFF and that her husband cosigned the note at the PLAINTIFF'S request.  According to Mrs. Haytcher's testimony, when she failed to pay, the PLAINTIFF filed a complaint with the Attorney Registration and Disciplinary Commission regarding her husband.  The DEBTOR introduced an affidavit, signed by the PLAINTIFF in September, 2005, in which she exonerates Mr. Haytcher from any culpability regarding the transaction with the DEBTOR.  In this Court's view, the falling out of the relationship between the PLAINTIFF and her former attorney has no bearing on the issues to be decided here.

[2] Although it is not clear from the testimony at trial when this occurred, at some point, the DEBTOR and Baldwin became more than just acquaintances.  Together, they formed PDQ Investments, a short-lived venture.  The DEBTOR testified that he wrote a check to "PDQ Investments," for $140,000, for the purchase of cars, at Baldwin's request, based on Baldwin's assurance that he would give the DEBTOR a check to cover the payment.  Baldwin gave the DEBTOR a check from his mother-in-law which did not clear.  Included in the bankruptcy schedules is a debt to First Midwest Bank in the amount of $142,437.67, for "check scam" listing the date as May, 2002.  The DEBTOR also testified that Baldwin stole checks from his house, used them to kite funds and ended up in jail.

2

The $5,000 supplied by the DEBTOR and Mrs. Haytcher wasn't sufficient according to Baldwin, who told them he needed more money. Regarding the investment as a "fabulous" opportunity, Mrs. Haytcher thought of her good friend, the PLAINTIFF, and both she and the DEBTOR met with the PLAINTIFF at her home to discuss the opportunity. The PLAINTIFF agreed to a loan of $5,000. Because she didn't know Baldwin well, the PLAINTIFF wanted the transaction drawn up as a loan to the DEBTOR and she demanded that the loan be secured with collateral. The DEBTOR indicated he had a house that could serve as collateral. The DEBTOR signed a handwritten note, written by Mrs. Haytcher that day, dated May 6, 2002, which read:

> I will pay Agnesrose Malik $7,000.00 on or before 14 days from date hereof.
> I will give a quit claim deed to 4110 - 21 Ave., Moline, Il. as collateral.

The PLAINTIFF paid $5,000 to the DEBTOR after he signed and gave her the note. The DEBTOR failed to repay the PLAINTIFF in fourteen days as promised and failed to deliver a quit claim deed to the property. The PLAINTIFF was not the only one left empty-handed. Neither Mrs. Haytcher nor the DEBTOR received anything from their investment in Baldwin's inheritance which turned out to be a fraudulent scheme.

The DEBTOR filed a Chapter 7 petition on October 15, 2005. The PLAINTIFF filed this Adversary Complaint to have the debt declared nondischargeable pursuant to Section 523(a)(2)(A), alleging that through false pretenses and representations the DEBTOR committed actual fraud by obtaining funds for an investment scam. A trial was held on October 5, 2006. The PLAINTIFF, Mrs. Haytcher and the DEBTOR testified.

The PLAINTIFF testified that she would not have made the loan without collateral. She testified that she attempted to contact the DEBTOR several times to request that he pay her what was owed or produce the deed which he had promised, but the DEBTOR would hang up on her. Although she admitted that the return of $2,000 in 14 days was probably too good to be true, she testified that she was relying on her trusted friend, Mrs. Haytcher, and that she and the DEBTOR were desperate for the funds.

According to Mrs. Haytcher's testimony, the PLAINTIFF was familiar with the property which the DEBTOR offered as collateral for the loan. She testified that at some point prior to the transaction at issue, she and the DEBTOR had taken the PLAINTIFF to inspect the property to determine whether the PLAINTIFF would be willing to invest funds in order that it could be rehabilitated and sold.[3] According to Mrs. Haytcher, the DEBTOR had a power of attorney for Shawn Quinlan, his nephew, who had purchased the property. Subsequent to the PLAINTIFF'S loan, Mrs. Haytcher, the DEBTOR and Baldwin had gone to the library and Baldwin had shown them pictures on the internet of the crates of money awaiting shipment.

According to the DEBTOR'S testimony, the PLAINTIFF wrote a check payable to him because Baldwin did not have a checking account and the PLAINTIFF did not trust Baldwin. The DEBTOR testified that the PLAINTIFF was aware that the money was going to be given to Baldwin. The DEBTOR testified that he cashed the check he received from the PLAINTIFF and gave the money to Baldwin. At the time the note was signed, the property was owned by Shawn Quinlan, the DEBTOR'S nephew. The DEBTOR and his

---

[3] The PLAINTIFF ended up not investing in the property.

4

nephew were partners in the property with Mrs. Haytcher and he, his nephew and Mrs. Haytcher were going to share the profits equally once the property was fixed up and sold. According to the DEBTOR'S testimony, the PLAINTIFF knew that his nephew was involved in the rehabilitation venture. In direct contradiction to the PLAINTIFF'S testimony, the DEBTOR testified that the PLAINTIFF never requested a deed, although he did not directly dispute that she attempted to call him.

The matter was taken under advisement. The Court, having considered the evidence presented and the credibility, candor and demeanor of the witnesses, finds that the PLAINTIFF has proved that her claim should be excepted from discharge.

**ANALYSIS**

A creditor seeking to establish an exception to the discharge of a debt bears the burden of proof. *Matter of Scarlata*, 979 F.2d 521 (7th Cir. 1992). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In order to effectuate the debtor's fresh start, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir.1994).

A debt for obtaining money or property by false pretenses, false representation or actual Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge a debt for obtaining money or property by "'actual fraud' as well as false pretenses and representations." Although three independent grounds for nondischargeability are listed, courts have historically applied a single, unified test to actions brought under this section. The traditional analysis contains the following elements: (1) the debtor made a

5

representation to the creditor; (2) the debtor's representation was false; (3) the debtor possessed *scienter*, i.e., an intent to deceive; (4) the creditor relied on the debtor's misrepresentation, resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). In *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), the court, expanding the definition of the term "actual fraud" to include nonrepresentational forms of fraud, stated:

> 'Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.'

*McClellan*, 217 F.3d at 893 (*quoting Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54 (Okla. 1952). Under the *McClellan* definition, for fraud not involving an affirmative misrepresentation, the creditor must establish (1) a fraud occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud created the debt that is the subject of the dispute. *In re Terranova*, 301 B.R. 509 (Bankr.N.D.Ill. 2003). Because this case concerns a misrepresentation, it is not necessary to conduct a *McClellan*-type analysis.

In the Court's view, the critical misrepresentation made by the DEBTOR was his written promise to give the PLAINTIFF a quit claim deed as collateral for her loan. Ordinarily, a fraudulent misrepresentation must relate to a past or existing fact, and may not be based upon a failure to perform a promise or agreement to do something at some future time. Only where the debtor never intended to perform at the time he made the promise will the misstatement of intention constitute a fraudulent misrepresentation. *Palmacci v. Umpierrez,* 121 F.3d 781, 786-87 (1st Cir. 1997); *Milwaukee Auction Galleries, Ltd.*

6

*v. Chalk,* 13 F.3d 1107, 1109 (7th Cir. 1994); *In re Alicea*, 230 B.R. 492 (Bankr.S.D.N.Y. 1999); *Matter of Dover*, 185 B.R. 85 (Bankr.N.D.Ga. 1995).

At issue is whether the DEBTOR made a false representation with the intent to deceive, and if so, whether the PLAINTIFF relied on that representation and whether that reliance was justifiable. The PLAINTIFF contends that she only agreed to make the $5,000 loan upon the DEBTOR'S promise to execute a quit claim deed to the property as collateral. A promise to provide collateral for a loan is properly viewed as an independent promise for purposes of evaluating fraud under Section 523(a)(2)(A). *In re Rudski,* --- B.R. ----, 2006 WL 3544881 (Bankr.N.D.Ohio 2006). Alternatively, the PLAINTIFF'S case is premised upon the DEBTOR'S alleged misrepresentation of ownership of the Moline property.

The Court finds that the DEBTOR did not affirmatively represent to the PLAINTIFF that he owned the property. The PLAINTIFF testified that she assumed he owned it based upon the fact that he was offering it as collateral. It is the DEBTOR'S position that his lack of ownership is irrelevant since he could have obtained the deed from the owner, Mr. Quinlan, had he wanted to. In fact, the DEBTOR testified that he offered the property as collateral at the May 6, 2002 meeting with the PLAINTIFF because Mr. Quinlan "O.K.'d it." This testimony is patently false. The May 6 meeting was the first time that Mrs. Haytcher and the DEBTOR had approached the PLAINTIFF about this deal. The DEBTOR had no idea that the PLAINTIFF would be demanding collateral so Mr. Quinlan could not have authorized it in advance of the meeting. Moreover, Mr. Quinlan was the sole obligor on the mortgage on the property. It is simply not believable that he would have acquiesced in giving a deed to his property to secure a loan related to a risky get-rich-quick scheme

7

that he wasn't even a part of.[4]  The DEBTOR'S false testimony impugns his credibility generally.

The DEBTOR (and Mrs. Haytcher) attempted to paint the PLAINTIFF as simply another unfortunate Baldwin investor, duped by a con-artist just like they were.  The Court, however, does not see it that way at all.  The PLAINTIFF refused to invest with or loan any money to Baldwin.  She was too smart for that.  She agreed to make a short-term loan only to the DEBTOR and only if it was secured.  Unlike the DEBTOR and Mrs. Haytcher, who failed to get anything in writing from Baldwin and who weren't even sure what their return would be, the PLAINTIFF made sure that her deal was evidenced by a signed writing.  The fact that a $2,000 bonus was to be paid to the PLAINTIFF is a reflection of how much the DEBTOR was taken with the scam and desperate for the additional funds. The Court believes the DEBTOR would have told the PLAINTIFF just about anything to obtain her $5,000 that he believed was needed to protect his own financial interest in the scheme.

The evidence supports a finding that when the DEBTOR signed the note on May 6, 2002 and took the PLAINTIFF'S $5,000, he had no intention of providing her with a quit claim deed to the property and intended to induce the PLAINTIFF to loan the money by making a false promise.  He had weeks to provide the deed and did nothing.  The DEBTOR was well experienced with real estate and could have easily prepared a quit claim deed without a lawyer.  No evidence was introduced that the DEBTOR ever raised the subject with the true owner of the property, Mr. Quinlan.  The DEBTOR argues that the

---

[4]There was no testimony that Quinlan gave any money to Baldwin.

PLAINTIFF never actually asked him for the deed. His obligation to provide the deed, however, was immediate and unconditional. No request was necessary. His attempt to blame the PLAINTIFF for not requesting the deed, while he refused to take her calls, smacks of obfuscation and disingenuousness.

The Court finds that the DEBTOR never intended to provide a quit claim deed to the property to the PLAINTIFF and his written statement to the contrary constitutes a false representation for purposes of Section 523(a)(2)(A). His statement that his nephew authorized the conveyance is not believable. Mrs. Haytcher's testimony that the DEBTOR was acting as his nephew's attorney in fact is equally suspect and unsubstantiated. Rather, the DEBTOR was willing to assuage the PLAINTIFF'S demand for security with an empty promise in order to further his self-interests.

The PLAINTIFF must also establish justifiable reliance on the DEBTOR'S misrepresentation. The PLAINTIFF testified that she would not have made the loan unless the DEBTOR provided some security and she testified that she relied on the DEBTOR'S promise to quit claim the Moline property to her. In order for that reliance to be "justifiable," something more than mere actual reliance is necessary, but the standard is less rigorous than that of reasonableness. It is not an objective standard, but is based upon the qualities and characteristics of the particular plaintiff and the circumstances of the particular case. *Field v. Mans,* 516 U.S. at 70, 116 S.Ct. at 444. Justifiable reliance requires only that the creditor not blindly rely upon a misrepresentation the falsity of which would be obvious with minimal inquiry. *In re Dobek*, 278 B.R. 496, 508 (Bankr.N.D.Ill. 2002). No duty to investigate is imposed unless the falsity is easily detectable. *Id.*

The PLAINTIFF'S testimony was entirely credible. She assumed from the previous investment proposal concerning the property that the DEBTOR had an ownership interest in it. Nothing the DEBTOR said or did at the May 6, 2002 meeting gave rise to any doubt about that conclusion. Moreover, she had no reason to doubt that the DEBTOR was acting honestly and in good faith on May 6, 2002. The PLAINTIFF accepted the DEBTOR at his word and her reliance on his promise of a quit claim deed was entirely justifiable.

**CONCLUSION**

Each of the elements of Section 523(a)(2)(A) has been proved. The DEBTOR represented to the PLAINTIFF that he would give her a quit claim deed to the Moline property to secure her $5,000 loan. This representation was false at the time it was made and was intended to deceive the PLAINTIFF. The PLAINTIFF justifiably relied on the false representation resulting in a loss to her in that what was supposed to be a secured loan turned out to be unsecured and unpaid. The DEBTOR'S debt to the PLAINTIFF in the amount of $7,000 is determined to be nondischargeable. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###